IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FILED

01 AUG 24 AM 9:44

U.S. DISTRICT COURT
N.D. OF ALABAMA

WILLIAM SATCHER,            )

    PLAINTIFF,            )

VS.                        )            CV-00-H-1046-W

NORTH AMERICAN REFRACTORIES CO.,)

    DEFENDANT.            )

**ENTERED**

AUG 2 4 2001

## MEMORANDUM OF DECISION

The Court has before it the June 29, 2001 motion of defendant North American Refractories Co. ("NARCO") for summary judgment. Pursuant to the Court's July 17, 2001 order, the motion was deemed submitted, without oral argument, on August 6, 2001.

### I. Procedural History

Plaintiff Satcher commenced this action on April 20, 2000 by filing a complaint in this Court alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, 42 U.S.C. § 1981, the Civil Rights Act of 1991, and the laws of the State of Alabama. Plaintiff contended that Defendant's alleged conduct constitutes (1) race discrimination, (2) retaliation, and (3) outrage. Defendant's June 29, 2001 motion for summary judgment

42

asserts that Plaintiff has failed to rebut Defendant's legitimate and nondiscriminatory reasons for the conduct at issue and that Defendant is otherwise entitled to summary judgment based on Plaintiff's post-termination misconduct.

Both parties have filed briefs and submitted evidence in support of their respective positions. Defendant submitted evidence[1] in support of its own motion for summary judgment and filed a supporting brief on June 29, 2001. On July 23, 2001, Plaintiff filed evidence[2] in opposition to Defendant's motion for

---

[1] The defendant submitted depositions of William Satcher, Robert Tippens, Norman Groth, and Ralf Brack and an affidavit of David Vandenberg.

[2] The plaintiff submitted a videotaped deposition of Ralf Brack; affidavits of William Satcher, Darvi Beale & Dennis Acker; the EEOC Charge of Darvi Beale; Exhibits to Groth's deposition (handwritten memo by Groth, Daily/Weekly Report of Work, sketch of office when Plaintiff was terminated, and an attendance policy); Incident Reports of 5/11/00 altercation between Tony Ford and David Vandenberg; Corrective Action Notices given to Tony Ford in May 2000 and to Floyd Boyd in December 1999; Plaintiff's EEOC file (including Plaintiff's charge, Defendant's Response to the EEOC, Right to Sue Letter, information regarding mediation, correspondence, and Plaintiff's handwritten accounts of events on May 14, 18 & 19, 1999); Wage rates of Plaintiff and David Vandenberg; Vandenberg's March 2000 resignation and withdrawal of resignation; April 21, 1999 Memo from Norman Groth to Norm Sam; Analysis of Charge by Defendant; and Plaintiff's work history from 5/3/99 to 5/19/99. Plaintiff has referenced Defendant's evidentiary submission for the depositions of William Satcher, Robert Tippens, Norman Groth, and Ralf Brack.
With regard to the videotaped deposition of Ralf Brack, taken May 3, 2001, the Court has relied upon the written

summary judgment.  On August 6, 2001, Plaintiff filed a brief in response to the defendant's motion for summary judgment.

At pre-trial conference on July 18, 2001, Plaintiff abandoned all counts and claims other than his disparate treatment claim under Count Two and his retaliation claim under Count Six.  Therefore, the Court will only address those portions of Defendant's motion for summary judgment relating to those remaining claims.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000)  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or

─────────────────

transcript of such deposition, filed as Exhibit "D" to Defendant's July 6, 2001 evidentiary submissions and has not viewed the two videotapes thereof submitted by Plaintiff.

filings which it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp.</u>, 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. <u>Id.</u> at 324.

The substantive law will identify which facts are material and which are irrelevant. <u>Chapman</u>, 229 F.3d at 1023; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. <u>Chapman</u>, 229 F.3d at 1023; <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>Chapman</u>, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real</u>

4

Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a

simple statement that the non-moving party cannot meet its burden
at trial but does not require evidence negating the non-movant's
claim; it simply requires the movant to point out to the district
court that there is an absence of evidence to support the non-
moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the
movant meets its initial burden by using this second method, the
non-moving party may either point out to the court record
evidence, overlooked or ignored by the movant, sufficient to
withstand a directed verdict, or the non-moving party may come
forward with additional evidence sufficient to withstand a
directed verdict motion at trial based on the alleged evidentiary
deficiency.  However, when responding, the non-movant can no
longer rest on mere allegations, but must set forth evidence of
specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing
Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

Defendant NARCO is a service company that is engaged in the
business of providing labor and materials to steel manufacturing
companies.  (Groth dep. 12).  NARCO was Plaintiff's employer from
May 1, 1999 through May 19, 1999.

_____

[3]  Facts are undisputed unless otherwise expressly noted.

From June 1998 through May 1, 1999, Plaintiff was employed by BISCO.  (Pl. dep. 54).  During that time, BISCO had a contract with Tuscaloosa Steel Company to provide labor and materials necessary to repair vessels and ladles of Tuscaloosa Steel. Effective May 1, 1999, NARCO entered into a similar contract with Tuscaloosa Steel and BISCO's contract ended.  (Groth dep. 19-24). A team of BISCO employees who had been working on its contract with Tuscaloosa Steel, including Plaintiff, became employees of NARCO as of May 1, 1999.[4]  (Groth dep. 19-20).  Their supervisor at BISCO, Ralf Brack (German-American) also was hired by NARCO, effective May 1, 1999.  The team of BISCO employees included David Vandenberg (white; team leader), Plaintiff (African-American), Tony Ford (white) and Bobby Busby (white). (Groth dep. 21).  Bob Tippens, Operation Manager for NARCO, made the decision to hire the BISCO employees, including Plaintiff, on his visit to Tuscaloosa Steel in April 1999.  (Tippens dep. 23-25; Pl. dep. 203-04).  BISCO and NARCO are not related in any way.

Brack was responsible for the BISCO team, including Plaintiff, being hired by NARCO.  (Pl. dep. 138).  **While employed**

---

[4]  The team of four BISCO employees was hired by NARCO at the recommendation of Tuscaloosa Steel because of their familiarity and experience with the job at Tuscaloosa Steel. (Tippens dep. 25).

7

**at BISCO, and prior to his employment at NARCO**, some incidents occurred involving primarily Plaintiff and Ralf Brack.  These incidents include:  (1) Brack allegedly discharging four African-American employees so that Plaintiff became the only African-American employee (Pl. dep. 106-10); (2) Brack allegedly blaming Plaintiff for bricks being stacked incorrectly and falling when Plaintiff was not at work; (3) Brack laying Plaintiff off for two weeks when Plaintiff's arm was in a cast and, at the end of two weeks, telling him not to come back (although Plaintiff did come back and continued working for BISCO) (Pl. dep. 140-46; Acker aff. ¶¶ 4-5); (4) Brack refusing to give Robert Ford, another African-American employee, a ride into work upon seeing his vehicle on the side of the road having run out of gas two weeks prior to Plaintiff beginning employment with BISCO (Pl. dep. 162-63); (5) Plaintiff hitting David Vandenberg; (6) Brack allegedly sending Plaintiff home from work early and then disciplining him for leaving work early (Pl. dep. 139, 185; BISCO Disciplinary Notice (March 19, 1999)); (7) Beasley and Scott coming to work with alcohol on their breath and nothing being done about it (Pl. dep. 158); and (8) Brack not allowing Plaintiff to work

8

overtime.[5]  (Pl. dep. 165-66; Brack dep. 67). According to

Plaintiff, Brack also allegedly made statements to Plaintiff

during his employment with BISCO that Plaintiff perceived to be

"race-related", including (1) a statement on Plaintiff's first

day of work that he (Brack) was not a racist, no matter what

Plaintiff heard (Pl. dep. 121); (2) a statement after firing

Plaintiff's unrelated, African-American co-worker, Andre, that he

had fired Plaintiff's "brother" (Pl. dep. 46, 162); and (3)

statements regarding African people eating with their hands and

eating like monkeys.[6]  (Pl. dep. 61-71, 83-88).

   At the time Plaintiff was employed with BISCO, Norman Groth

was employed with NARCO to provide consulting services for

Tuscaloosa Steel (Groth dep. 24-26); he went to Tuscaloosa Steel

once a week from December 1996 through May 1, 1999 and provided

---

   [5]  Plaintiff has provided little evidence of these alleged
incidents beyond his own subjective allegations.  (See Acker
aff.; BISCO Disciplinary Notice (March 19, 1999) (documenting
Plaintiff's suspension for absence without permission)).

   [6]  Brack denies making these statements other than the first
statement that he was not a racist.  (Brack dep. 29, 39-41, 98,
104, 120).  Brack also testified that he had lived in Africa and
had actually witnessed African people eating with their hands,
although he denies making those statements to Plaintiff or in the
workplace.  (Brack dep. 104-05).  Brack testified that he never
really had any problems with Plaintiff's work and that he
considered Plaintiff's work to be equal to that of the other
employees at BISCO and at NARCO.  (Brack dep. 22, 68-69, 112).

refractories and laid brick.  (Groth dep. 28, 42-43).  Groth
worked alongside Plaintiff and the BISCO team at Tuscaloosa Steel
and was familiar with the BISCO team.  Groth later became site
supervisor for NARCO at Tuscaloosa Steel on May 1, 1999. (Pl.
dep. 131; Groth dep. 74).  From his experience at Tuscaloosa
Steel during the BISCO contract, Groth knew of Plaintiff's
complaints about working with Brack, and he allegedly told
Plaintiff that NARCO was not going to hire Brack. (Pl. dep. 134-
35, 148, 203; Groth dep. 10, 47-50, 61).  According to Groth,
Plaintiff complained that he and Brack "just . . . couldn't get
along together . . . it was very--extremely hard for anybody to
work with [Brack]."  Prior to May 1, 1999, Groth told Tippens
that he had some concerns with hiring Brack.  (Groth dep. 82).
However, before May 1999, he never complained to anyone at NARCO
about Brack.  (Groth dep. 83).

     Brack was regarded as difficult to work for by employees of
BISCO and employees of NARCO.  He was considered to treat all
employees badly, not just Plaintiff.  (Tippens dep. 59; Groth
dep. 84-85, 90, 99, 114-15).  According to Groth, although Groth
was NARCO's site supervisor to whom Brack reported, Brack told
Groth that he would never work for Groth and that "all Americans
were stupid."  (Groth dep. 46, 104).  Groth testified that Brack

was racist to all races other than the German race.  (Groth dep.

108).  Groth also testified that Brack treated him with

disrespect and treated all employees "terribly."  (Groth dep. 56-

57).  Prior to May 1, 1999, he stated that "everyone talked to

[him] and told [him] problems they had with Mr. Brack being mean,

pushy, and disrespectful.  (Groth dep. 43-44, 48, 52-53, 55-57,

60, 106).  However, according to Plaintiff, almost every time

they completed a job, Brack would praise all of the team,

including Plaintiff, for their good work.  (Pl. dep. 114-15;

Pl.'s Exh. 8, Plaintiff's account of events on May 18, 1999, HH

0015).

Dennis Acker was employed by Tuscaloosa Steel as its manager

over the Electric Arc Furnace division,[7] and he recommended to

NARCO that it hire the BISCO crew to perform its contract with

Tuscaloosa Steel.  (Tippens dep. 25; Acker Aff. ¶ 2).  Acker

testified that at NARCO, Plaintiff was "an outspoken individual"

---

[7]  Acker had previously worked with Plaintiff at a steel
mill in Lemont, Illinois.  He had Plaintiff to come to Tuscaloosa
Steel to work for him.  (Acker aff. ¶ 2).  Plaintiff complained
to Acker about Brack and told Acker that he thought Brack was
prejudiced while Plaintiff was employed with BISCO.  (Id. ¶ 3).
Plaintiff alleges that Acker told Plaintiff that he thought Brack
was prejudiced.  (Pl. dep. 146-47).  The Court notes that Acker
was not an employee of Defendant NARCO and was not a
decisionmaker in the employment decisions at issue in this case.

11

who became the "spokesperson" of many black and white employees. (Acker aff. ¶ 3). According to Plaintiff, Acker allegedly told Plaintiff that after Brack resigned from NARCO in early 2000, "the guys" came and told him the truth about what was really going on. (Pl. dep. 57).

**Plaintiff was only employed with NARCO for nineteen days.** His employment was terminated on May 19, 1999 by Bob Tippens, NARCO's Operations Manager, who had made the decision to hire Plaintiff and the other four BISCO employees; Tippens was only at Tuscaloosa Steel intermittently at that time, traveling back and forth from Indianapolis. (Tippens dep. 21). No one had reported the problems with Brack to Tippens during May of 1999. (Tippens dep. 25-26). Tippens never received any complaints of race discrimination or inappropriate conduct against Brack. (Tippens dep. 23, 72).

Early in May, Tippens warned Groth that NARCO would not tolerate fighting or similar conduct. (Groth dep. 82-83). On May 14, Brack, Plaintiff, and the other three members of the crew were upset when NARCO's first pay checks were not the amounts the employees had expected. (Tippens dep. 97-98; Pl. dep. 167-69). Groth explained that the checks were estimates, because NARCO was changing its computer system, and that any error would be

12

corrected on the employee's pay check.   (Tippens dep. 97-98; Pl. dep. 169-70).   According to Plaintiff, Brack started cursing and raising his voice, and Plaintiff went to report what was going on to Groth.   (Pl. dep. 169).   Plaintiff, Brack, and the other employees went to Groth to discuss the paycheck situation, but other than Plaintiff, none of the other employees said anything. (Pl. dep. 169; Tippens dep. 34-35; Groth dep. 97-99; Brack Memo; Pl.'s Exh. 8, Plaintiff's account of the May 14, 1999 paycheck incident, HH 0013-0014).

On the morning of May 19, 1999, Tippens came on a routine visit to Tuscaloosa Steel.   He was informed by Brack or Groth that there were complaints about Plaintiff from other hourly employees and that there had been a meeting on May 14 when Plaintiff had tried to organize the rest of the crew against Brack.   (Tippens dep. 28-29).   Tippens then talked to David Vandenberg, who told him that Plaintiff had struck Vandenberg; that Plaintiff would occasionally fail to perform his portion of the work; and that Plaintiff would frequently disappear for long periods of time when he went to get supplies on the tow motor.[8]

---

[8]   Plaintiff testified that he was only on a tow motor or forklift on one occasion which was when he was employed by BISCO. (See Pl.'s aff. ¶ 5).

13

(Tippens dep. 29; Vandenberg aff. ¶¶ 5-6).  Tippens then talked

to the other three hourly employees who made complaints similar

to Vandenberg's and complained that they had to pick up slack

from Plaintiff.  (Tippens dep. 28-30, 33).  Tippens also talked

to Groth and was told the same thing.  (Tippens dep. 31-32; Brack

dep. 46-49).  Tippens then made the initial decision to terminate

Plaintiff.[9]  (Brack dep. 30; Tippens dep. 28-29, 41).  According

to Tippens, he made this decision upon the recommendation of

Brack; Brack denies making such a recommendation.  Plaintiff,

Tippens, Brack, and Groth were present at the meeting where

Plaintiff's employment was terminated.  (Tippens dep. 36).  Brack

and Tippens informed Plaintiff that his employment was being

terminated for insubordination and poor work performance.[10]  (Pl.

---

[9]  For clarification, the Court notes that **Tippens** was the
decisionmaker with regard to Plaintiff's termination.  Tippens
instructed Brack to inform Plaintiff that his employment was
being terminated, which Brack did; Tippens felt that Brack was
not properly articulating the reasons for Plaintiff's
termination, so Tippens then joined in by telling Plaintiff that
he was being terminated for poor work performance and
insubordination.  (Tippens dep. 41, 46-47; Groth dep. 117).

[10]  Plaintiff alleges that an incident involving setting a
block which happened in May 1999 had something to do with him
getting fired.  He alleges that the block was set crooked, and
Brack blamed Plaintiff for it, when Brack was the one who had set
the block.  (Pl. dep. 157-58).  Plaintiff also alleges that Brack
told him he was being fired for what happened at BISCO.  (Pl.
dep. 171).  Plaintiff testified that no one ever complained that

dep. 158, 171; Tippens dep. 34, 70; Groth 149, 181; Brack 54-56, 64, 71, 83, 89-90, 95-96; Pl.'s Exh. 8, Plaintiff's Account of the May 19, 1999 termination meeting, HH 0016).  The insubordination involved the paycheck incident between Plaintiff and Brack which occurred on May 14, 1999.  (Pl. dep. 167-170; Tippens dep. 34; Brack 56-58, 60-63).

Tippens had not talked to Plaintiff about the allegations against him prior to this meeting.  (Tippens dep. 30).  According to Tippens, he had not absolutely decided to terminate Satcher but might have given him another chance if there was good reason.[11]  (Tippens dep. 36).

Upon being informed of his termination, Plaintiff moved toward Brack until he was within approximately one and one-half feet from Brack with his fist cocked.  Tippens and Groth said "No, Billy, don't do it."  Plaintiff was angry.  He made some remarks to Brack and threw his leather glove(s), which hit Brack,

---

he was not doing his work or that he was slack.  (See Pl.'s Aff. ¶ 5).

[11]  Tippens testified:  "I've done this before, gone to a meeting to terminate people and if I hear something, maybe there's a reason, an excuse, I'll give a guy another chance." (Tippens dep. 36).  Tippens also testified that had he known some of the "extenuating factors" going on, not only with Plaintiff, but with the whole crew and Groth, the whole situation would have been different.  (Tippens dep. 49).

on his way out of the room.[12] (Pl. dep. 172-73; Tippens dep. 42-45; Groth dep. 109-10, 116-17, 163-66; Brack dep. 49-51). Plaintiff said or may have said the following to Brack: (1) "I'm going to get you no matter where;" (2) "You've been trying to get rid of me for some time now because I stand up for myself, and I don't let you talk crazy to me;" (3) "I'm going to mess you up real bad;" and (4) "I'll see you in court." (Pl. dep. 171-72; Tippens dep. 42-45, 47-48; Groth 110, 118-19, 159-63; Brack dep. 52-53, 96; Brack Memo to Whom it May Concern (May 19, 1999); Pl.'s Exh. 8, Plaintiff's written account of the May 19, 1999 termination meeting, HH 0016). Prior to May 19, 1999, Plaintiff had told Groth that he was going to slap Brack and do bodily harm to Brack. (Groth dep. 112-14, 116, 150).

Plaintiff then went up to the deck to get his tools from his locker. David Vandenberg was working on the deck. Plaintiff was mad and disappointed at Vandenberg. He made some remarks to Vandenberg and then hit or pushed Vandenberg in the face between

---

[12]   Plaintiff alleges that he did not throw his gloves "at Brack" but, rather, he threw his gloves behind him as he was leaving the room and did not see where they landed. (Plaintiff dep. 173). At least one glove hit Brack either in the chest or in the face. (Brack dep. 51). Tippens testified that he saw a red mark on Brack's chest after he was hit with the glove(s). (Tippens dep. 44).

his eye and ear; Vandenberg fell backward.[13]   (Pl. dep. 173-79;

Vandenberg aff. ¶ 7; Groth dep. 120, 140-41, 157; NARCO Accident

Investigation Report (May 21, 1999)).   Vandenberg, Busby and Ford

reported to Groth that Plaintiff had hit Vandenberg with his fist

causing Vandenberg's hard hat to fly into the road.   (Groth dep.

140, 142-43; see Brack Memo to Whom it May Concern (May 19,

1999)).   The accident report indicated "swelling to the right

_____

[13]   Plaintiff disputes that he hit Vandenberg in the face
with a closed fist; he alleges that he "pushed" Vandenberg in the
face and that Vandenberg tripped on an air hose.   Plaintiff is a
former boxer and weighs approximately 220 pounds; Vandenberg
weighs approximately 150 pounds.   According to Plaintiff, if he
had hit Vandenberg, he would probably have broken Vandenberg's
jaw.   (Plaintiff dep. 176-79; Pl.'s aff. ¶ 6).   Dennis Acker
testified that Vandenberg later told him that Plaintiff had not
hit him but had pushed him.   (Acker aff. ¶ 6).   However, Tippens
and Groth testified that they saw Vandenberg after the incident
with Plaintiff and the side of Vandenberg's face was red in
between his ear and neck.   (Tippens dep. 62-65; Groth dep. 153-
54).   The Court notes that it is immaterial whether Plaintiff
"hit" Vandenberg or "pushed" Vandenberg in the face, because in
either case Plaintiff' conduct toward Vandenberg constituted
assault and battery.   (See Black's Law Dictionary (7th ed.
1999)(defining "assault" as "the act of putting another person in
reasonable fear or apprehension of an immediate battery by means
of an act amounting to an attempt or threat to commit a battery";
defining "battery" as "an intentional and offensive touching of
another without lawful justification").   Likewise, assuming that
Plaintiff did not intend to hit Brack with the gloves, Plaintiff
at least committed "assault" against Brack as well.

Plaintiff alleges that Brack had earlier tried to pay
Plaintiff to beat up Vandenberg and that Vandenberg helped Brack
lie about Plaintiff's performance.   (Pl. dep. 173-74, 205-06; Pl.
Aff. ¶ 4).

side." (Groth dep. 154; NARCO Accident Investigation Report (May 21, 1999)). Subsequently, Plaintiff left the building and received a ride home from Groth, who had been on his way to the Administration building when Plaintiff flagged him down and stated to him that Plaintiff needed to get out of there before he killed him (Brack).[14]  (Pl. dep. 186; Groth dep. 119, 171-72). The police were called, and they wrote a report on the incident between Plaintiff and Vandenberg.  (Brack dep. 76-77; Vandenberg aff. ¶ 7; Complaint/Incident/Report (May 19, 1999)).  Vandenberg did not press charges.  (Tippens dep. 61-67; See Brack Memo (May 19, 1999) (stating that Vandenberg told police he was afraid to press charges against Plaintiff)).  That evening, Vandenberg went to the emergency room because of headaches after the incident with Plaintiff.  (Vandenberg Aff. ¶ 7; Pl. dep. 181-83; Tippens dep. 68; DCH Emergency Dept. Records (May 19, 1999)).  The diagnosis was "cervical strain, scalp contusion, CHI"; Vandenberg was prescribed Toradol and told to return to work in 2-3 days. (DCH Emergency Dept. Records (May 19, 1999)).  He returned to

---

[14]  According to Plaintiff, on the ride home Groth told him that Brack was prejudiced and that Plaintiff should get a lawyer. (Pl. dep. 45).  According to Plaintiff, Groth's wife told Plaintiff that Brack was prejudiced, "hated black[s]," and was trying to get rid of Plaintiff.  (Pl. dep. 50).

work the following day, May 20, 1999.

Because of Plaintiff's actions, Tippens decided that "there was no second chance," and Plaintiff was terminated.  (Tippens dep. 36).

Plaintiff had hit Vandenberg and Ronnie Wake, a co-worker at Tuscaloosa Steel who was an employee of Louie Grant, on other occasions prior to May 19, 1999.  (Brack dep. 64; Vandenberg aff. ¶ 4; Brack Memo (May 19, 1999)).  Plaintiff alleges that he, Vandenberg, Wake, and Brack were horse playing when he hit Vandenberg in the stomach and chest and "body punched" him.  (Pl. dep. 188, 201-02; Groth dep. 157-58; Brack dep. 83; Pl.'s aff. ¶ 3).  According to Vandenberg, Plaintiff's blows knocked the breath out of him (Vandenberg Aff. ¶ 4), which Plaintiff denies. Plaintiff alleges that Vandenberg and Brack hit him on his "butt, shoulder, stomach and arm" and that on one occasion, Vandenberg pushed Plaintiff against the trailer where Brack's office was, so hard that Brack came out of the trailer to investigate.  (See Pl.'s aff. ¶ 3).

On May 20, 1999, Brack wrote a report on the events surrounding Plaintiff's termination.  (Brack dep. 119-20; Memo to Whom it May Concern (May 19, 1999)).  In that report, Brack stated that Plaintiff threatened him with bodily harm and

19

attempted to strike him three times.  (See Memo to Whom it May
Concern (May 19, 1999)).  Brack also reported that Plaintiff had
struck Vandenberg in the stomach approximately three months ago
(during his employment at BISCO) and had also struck Wake on May
18, 1999 and two weeks prior to Plaintiff's termination.  (Groth
dep. 159-69; Brack dep. 47, 84; Brack Memo (May 19, 1999)).
Brack reported on the May 14, 1999 paycheck incident and that
Plaintiff had accused him of being racist and prejudiced.  (Brack
dep. 86-88; Brack Memo).  Brack reported that on May 14, 1999,
Plaintiff yelled at him, blocked his office door, "point[ed] his
finger in [Brack's] face in a threatening manner," and "raised
his hand as if to strike [Brack]."  (Brack Memo).  Brack's
Memorandum recording all of the above events was signed by David
Vandenberg and Tony Ford.

     On May 20, 1999, Tippens wrote a memo to NARCO Human
Resources regarding Plaintiff. (Tippens dep. 16-17).  In the
memo, he stated that Plaintiff had been terminated for "poor work
performance, insubordination to his supervisor, Mr. Ralf Brack,
and threatening Mr. Brack with physical harm." (Memorandum from
Bob Tippens to Human Resources (May 20, 1999)). He also detailed
the events occurring after Plaintiff's termination:  Plaintiff
"threw his gloves at Mr. Brack and started to go after him . . .

before he left the room, he threatened to get Ralf outside of the shop.  Then he went to the ladle area and physically assaulted one of our other employees, David Vandenberg the team leader and threatened him outside of the shop."  (Id.).  This memo was signed by Tony Ford, Bobby Beasley, David Vandenberg, and Ronnie Wake.  (Id.).  Tippens forwarded everything he had on Plaintiff to Human Resources, and he talked with a NARCO attorney and Burkhart, the Vice President of NARCO Human Resources, regarding Plaintiff.  (Tippens dep. 13-17).

On June 10, 1999, Plaintiff filed a charge of discrimination with the EEOC alleging (1) that during the past 18 months, NARCO or BISCO had terminated four African-American workers and had terminated no workers of any other race during that time; (2) that he was fired by Brack, a German-American with a reputation for being a racist; and (3) that he was discharged because of his race, although he was allegedly fired for poor work performance.  (See EEOC Charge, June 10, 1999).[15]

---

[15]  Plaintiff has submitted evidence relating to Darvi Beale (Beale's affidavit and Beale's Feb. 19, 2000 EEOC Charge).  This evidence consists of allegations by Beale against Brack during his employment with Whitsett (the predecessor of BISCO on the Tuscaloosa Steel contract) and BISCO, neither of which are defendants in this case.  The Beale evidence also includes allegations of race-related conduct on the part of Brack during Beale's employment with Defendant NARCO, September 1999 through

## IV. Applicable Substantive Law and Analysis

Plaintiff claims disparate treatment racial discrimination
and retaliation under 42 U.S.C. § 1981.  Section 1981 provides
that:

> All persons within the jurisdiction of the United
> States shall have the same right in every State and
> Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens,

---

January 2000.  The Court notes that none of the Beale evidence
relates to the time period material to this action, the nineteen
days during which Plaintiff was employed with Defendant NARCO.
The events alleged by Beale occurred either before Plaintiff
became employed by NARCO or four to eight months after
Plaintiff's employment with NARCO.  Furthermore, some of Beale's
allegations are based on hearsay, and none of the Beale evidence
relates in any way to Tippens, the decisionmaker at issue in the
instant case.  (See Pl.'s Exh. 3, Beale Affidavit; Pl.'s Exh. A,
Beale EEOC Charge (Feb. 19, 2000)). For these reasons, the Beale
evidence is of little relevance to the case at bar.

Plaintiff has also submitted evidence of Incident Reports
and Corrective Action Notices issued (1) to Tony Ford concerning
incidents involving Ford, Vandenberg, and Floyd Boyd; and (2) to
Floyd Boyd to serve as written warning relating to an unexcused
absence.  The Ford reports are dated approximately one year after
Plaintiff's employment at NARCO ended and are signed by Groth and
also by supervisor Delbert Edwards, who was not in any way
involved in the events material to this action.  They do not
involve Tippens, the decisionmaker in the employment decisions
involving Plaintiff, nor do they involve Brack, the only person
whom Plaintiff has accused of race discrimination.  (See Pl.'s
Exhs. 11, 12 & 13).  The Boyd notices are dated approximately 7
months after Plaintiff's employment with NARCO ended and do not
relate to Tippens or to the time period material to this action.
(See Pl.'s Exh. 21).  For these reasons, this evidence is of
little relevance.

22

> and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981(a) (1994).[16]  The Court is aware that the

summary judgment rule applies in job discrimination cases just as

in other cases.  See Chapman, 229 F.3d at 1025 (rejecting an

earlier, contrary general rule and emphasizing that no thumb is

to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined

not only by the nature of the allegations but also by the quality

of the evidence offered in support of those claims.  See

Standard, 161 F.3d at 1330 (noting that "[t]he analytical

framework and burden of production var[y] depending on the method

of proof chosen").  In general, a plaintiff may attempt to

establish a claim of illegal employment discrimination through

the use of direct evidence, circumstantial (indirect) evidence,

or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d

1257, 1266 (11th Cir. 1999) (recognizing the availability of

---

[16]   The same framework long used to analyze claims under
Title VII is also employed in assessing claims of employment
discrimination under § 1981.  See Standard v. A.B.E.L. Servs.,
Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  At pre-trial
conference, Plaintiff elected to proceed under § 1981, rather
than Title VII.  Thus, the Court will address Plaintiff's race
discrimination and retaliation claims under only § 1981.

either direct or circumstantial evidence).  A plaintiff's ability
to proceed through the use of circumstantial evidence of
discrimination is necessarily important because direct proof of
discrimination is uncommon.  <u>See Combs v. Plantation Patterns</u>,
106 F.3d 1519, 1537 (11th Cir. 1997); <u>Grigsby v. Reynolds Metals
Co.</u>, 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is
"[s]uch evidence [which], if believed, proves the existence of a
fact in issue without inference or presumption."  <u>Burns v.
Gadsden State Community College</u>, 908 F.2d 1512 (11th Cir. 1990).
<u>Cf. Wright v. Southland Corp.</u>, 187 F.3d 1287, 1293-94 (11th Cir.
1999) (per Tjoflat, J.) (defining direct evidence as "evidence
from which a reasonable trier of fact could find, more probably
than not, a causal link between an adverse employment action and
a protected personal characteristic" and finding the outcomes
reflected in prior case law consistent with that definition); <u>see
also</u> <u>Bass v. Board of County Commissioners, Orange County,
Florida</u>, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning
of "direct evidence" in the context of a Title VII race
discrimination claim; "direct evidence" refers to a type of
evidence which, if true, would require no inferential leap in
order for a court to find discrimination.").  However, direct
evidence does not include "stray remarks in the workplace" or

"statements by nondecisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J., concurring) (1989); see also EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990) (quoting Price Waterhouse).

Here, plaintiff has presented only circumstantial evidence of racial discrimination and retaliation.[17] "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527. Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. See id. at 1527-

---

[17] The statements alleged by Plaintiff regarding African people, Brack firing Plaintiff's "brother," and Brack not being a racist, do not constitute direct evidence of discrimination. Rather, they are examples of "stray remarks," unconnected with the decision making process, which do not rise to the level of direct evidence.

28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[18]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden

---

[18] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[19] See Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[20]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence

---

[19] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[20] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

27

offered to establish the prima facie case.  See Combs, 106 F.3d
at 1528.

Despite this shifting of the burden of production between
the plaintiff and the defendant under the McDonnell Douglas and
Burdine framework, "[t]he ultimate burden of persuading the trier
of fact that the defendant intentionally discriminated against
the plaintiff remains at all times with the plaintiff."  Burdine,
450 U.S. at 253.  Given that the ultimate burden of persuasion
always lies with the employee, a plaintiff may prevail on an
employment discrimination claim and may also defeat a summary
judgement either by proving that intentional discrimination did
indeed motivate the defendant or by producing sufficient evidence
to allow a rational trier of fact to disbelieve the employer's
proffered legitimate reasons, thus permitting but not compelling
the trier of fact to make a finding of illegal discrimination.
See Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097,
2108-09 (2000) (pointing out that the production of the necessary
sufficient evidence by plaintiff will not always prevent the
employer from prevailing on a Rule 50 motion and suggesting that
the strength of plaintiff's prima facie case, the probative value
of the proof that the employer's explanation is false, and any
other properly considered evidence that supports the employer's

case are among other factors to take into account in evaluating a Rule 50 motion);[21] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

Generally, to establish a prima facie case of retaliation a plaintiff must show:  (1) that he engaged in protected activity; (2) that his employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) there was a causal link between his protected activity and the adverse employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The burden-shifting framework outlined above for discrimination claims also applies to retaliation claims.

Defendant NARCO argues that it is entitled to summary judgment as to Plaintiff's race discrimination claims because (1) most of Plaintiff's complaints are against his former employer

---

[21] The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

BISCO, which is totally independent from NARCO, and he can therefore have no recovery against NARCO for these complaints; (2) assuming Plaintiff has established a prima facie case, he has failed to rebut Defendant's legitimate and nondiscriminatory reason for his termination, a decision which was made in good faith by Bob Tippens based on information he received from Plaintiff's supervisors, and Plaintiff has no evidence that Tippens was motivated by racial animus; and (3) even if NARCO wrongfully terminated Plaintiff, his post-termination conduct in assaulting a fellow employee is so indefensible that he forfeited his right to the protection of the statutes. (See Def.'s Br. 2). Plaintiff argues that he has made a prima facie case of discrimination and that he has demonstrated that Defendant's articulated reasons are pretext. (See Pl.'s Br. 23-26). Plaintiff 's argument focuses on his termination, and he argues that a reasonable jury could conclude that Defendant's purportedly "different versions" of Plaintiff's termination testified to by Tippens, Brack, and Groth are nothing more than pretext for intentional discrimination.[22]

---

[22]   Plaintiff submits that Defendant lacked policies and procedures and that Brack, Groth, and Tippens had not been trained on discrimination matters. (See Pl.'s Br. 13-14). While such evidence may be of some relevance, it is insufficient to

## 1. Disparate Treatment

Plaintiff claims disparate treatment based on his pay and the termination of his employment.[23]  The Court finds that Plaintiff has failed to establish these claims by substantial evidence.  It is undisputed that Plaintiff, an African-American, was a qualified member of a protected class and that he was subjected to adverse employment action:  (1) he was paid less than David Vandenberg, who is white; and (2) his employment was terminated.  However, Plaintiff has failed to establish that otherwise similarly situated employees outside the plaintiff's class were treated more favorably.

Plaintiff claims disparate pay comparing himself to David Vandenberg.  (Plaintiff dep. 193-94).  Plaintiff was paid $12.50

---

establish intentional race discrimination on the part of Defendant NARCO.  Plaintiff also submits that NARCO violated its corrective action policy in terminating Plaintiff; however, the evidence does not establish that there was such a policy in place during Plaintiff's nineteen-day employment with NARCO.  (See Groth dep. 126).

[23]  Plaintiff makes other allegations regarding overtime, work assignments, disciplinary action, criticism, and the firing of other African-American employees.  However, Plaintiff has provided insufficient evidence to establish a prima facie case of disparate treatment racial discrimination with regard to these allegations; the events underlying these allegations occurred during Plaintiff's employment with BISCO, and thus are not actionable.

per hour during his employment with NARCO.[24]  The other two NARCO laborers on the four-man Tuscaloosa Steel team, both of whom were white, were paid $12.50 per hour, the same as Plaintiff.[25] (Plaintiff dep. 151; see Memo from Groth to Norm Sam re: rates of pay (Apr. 21, 1999); Pl. aff. ¶ 2).  Vandenberg, the team leader, was paid $15.00 per hour.  (Pl. dep. 79-81; Vandenberg aff. ¶ 2; see also Pl.'s Exhs. 15 & 16).  Vandenberg was also paid more than Plaintiff and the other laborers at BISCO.[26]  (Pl. dep. 151-52).  It is undisputed that Vandenberg was the team leader and thus had a different title, position, and responsibilities than Plaintiff, and he also had more seniority/experience than

_____

[24] Plaintiff alleges that he was promoted from laborer to brick layer in January 1999 by BISCO, but he did not receive a pay increase.  (Plaintiff dep. 151; Brack dep. 22-23, 69).  He alleges that he and Vandenberg were both bricklayers, and Beasley and Ford were laborers.  (Pl. dep. 74-81).  Even assuming this is true, it is undisputed that Vandenberg was the team leader and had more seniority and experience as a bricklayer than Plaintiff, and NARCO management believed him to be more qualified for these reasons.  (See id.; Brack dep. 69-71).

[25] Plaintiff alleges that Groth told him the laborers were going to get a pay raise in May 1999.  (Pl. dep. 150-51). Vandenberg did get a raise but no one else did when NARCO took over.  (Pl. dep. 151-52).  See Memo from Norman Groth to Norm Sam (April 21, 1999) (stating that Plaintiff, Vandenberg, and Ford had been interviewed and giving their hourly rates of pay at NARCO as $12.50, $15.00, and $12.50, respectively).

[26] Vandenberg was a bricklayer at BISCO when Plaintiff worked at BISCO as a laborer.  Pl. dep. 54, 56).

Plaintiff.[27]   (Pl.

---

[27]   In his deposition, Plaintiff testified as follows:

**Q.  Do you have any reason to dispute that NARCO's reason for giving [Vandenberg] a raise and not you was because they viewed David as being more qualified and had other responsibilities, including being a lead man?**

**A.  No.**

**Q.  You don't have any reason to dispute those?**

**A.  No.**

Q.  What's your basis for maintaining that you had more seniority and experience than David Vandenberg?

A.  I didn't have more -- I've been in the steel mill industry way longer than David Vandenberg.  I didn't -- I had more seniority than other guys there who Ralf was calling on to work overtime and not calling me.

Q.  Well, why do you say that you had more seniority and experience than Vandenberg?

**A.  No, I hadn't had more seniority than David Vandenberg.**

**Q.  You did not?**

**A.  No, because he was there longer than me.**

Q.  In fact, he had more experience laying brick than you, didn't he, if you know?

A.  I'm not sure of that.  I'm not sure of that because I don't know exactly when he started laying bricks. . . . (Pl. dep. 153-54) (emphasis added).

*  *  *

Q.  While you were employed by NARCO, is there anyone that was paid more than you that you thought -- do you think they should have been paid more than you were paid?

A.  If NARCO hired me to be a bricklayer, why still paying me twelve fifty and they're paying the laborers twelve fifty.  I don't think that was right. **David Vandenberg was getting fifteen dollars.  I don't think that was right.  Even though if he the lead man, the lead man for the jobs I done did, the jobs I done been on, the lead man always get a dollar or two more, you know.  I didn't see why I didn't get no raise.  I** was still getting labor pay.  (Pl. dep. 192-93)

dep. 56, 152-54, 192-94; Groth dep. 190-92; Brack dep. 109-11; Pl.'s aff. ¶ 2).  Therefore, it is doubtful that Vandenberg is a proper comparator for Plaintiff's disparate pay claims.[28]

Assuming, without deciding, that Vandenberg is a proper comparator and Plaintiff has established his prima facie case,

---

(emphasis added)

*  *  *

Q.  In the union now [**after Plaintiff's termination from NARCO**], is there a difference between a bricklayer and a laborer? . . .
A.  A bricklayer -- a bricklayer lays bricks and laborer provides the brick layer with the bricks. . . .
Q.  Is there a difference in pay?
A.  Yes, sir.
Q.  **What's the difference in pay?**
A.  **It's different scales, like I'm a second year apprentice and there's a different scale.  I'm not no full bricklayer, but I still do bricklayer work.**
Q.  Bricklayers get paid more than laborers?
A.  Apprentice.
Q.  Or apprentices?
A.  Yeah.  (Pl. dep. 54-55) (emphasis added).

[28] In order to establish a prima facie case of disparate treatment, a plaintiff must show a comparator who is "similarly situated in all relevant aspects."  Silvera v. Orange County School Board, 244 F.3d 1253, 1259 (11th Cir. 2001).  For example, in the disciplinary context, "the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'"  Id. (citing Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis added).  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Plaintiff has failed to rebut as pretext Defendant's legitimate and nondiscriminatory reason for paying Vandenberg more than Plaintiff: his team leader position and his qualifications (seniority and experience). (Plaintiff dep. 153-54). See Chapman, 229 F.3d at 1024-25. Nor has Plaintiff otherwise proved that intentional discrimination did indeed motivate the defendant. Therefore, Defendant is entitled to summary judgment in its favor on Plaintiff's disparate pay claims.

Plaintiff has failed to allege or provide evidence of any comparator who was otherwise similarly situated but treated more favorably with regard to his disparate treatment termination claim. Thus, Plaintiff has failed to establish a prima facie case of disparate treatment with regard to his termination. Plaintiff has provided evidence that he was replaced by a white employee. (See Brack dep. 107; Compl. ¶ 51). While this may be relevant, the proper comparison for purposes of Plaintiff's termination, is whether otherwise similarly situated white employees, who had committed comparable misconduct and exhibited comparable poor work performance, were treated more favorably than Plaintiff. See Silvera, 244 F.3d at 1259. Plaintiff has submitted no evidence of white employees who had exhibited poor work performance, struck co-workers, or were regarded to have

35

been insubordinate by their supervisor and were treated more favorably than Plaintiff.

Even assuming that Plaintiff had established a prima facie case as to this claim, Plaintiff has failed to rebut Defendant's legitimate and nondiscriminatory reasons for the conduct at issue: that Plaintiff's superior believed that Plaintiff had been insubordinate, had demonstrated poor work performance, and had assaulted a fellow employee. The decisionmaker was Bob Tippens, Operations Manager. (Pl. dep. 111-12; Pl.'s Exh. 14, Defendant's Response to EEOC (Aug. 11, 1999), D 0096). Tippens testified that, after talking to Brack[29] and to other employees on the morning of May 19, 1999, he made the decision that Plaintiff's employment should be terminated for insubordination, poor work performance, and for assaulting other employees. (Pl. dep. 113; Tippens dep. 34, 70; Memorandum from Tippens to NARCO Human Resources (May 20, 1999); Pl.'s Exh. 18, Defendant's Analysis of Charge).

A subjective reason is a legally sufficient, legitimate,

---

[29]   Brack denies that he made a recommendation to Tippens that Plaintiff be fired. (Brack dep. 54). This fact is immaterial to the decision in this case, because Brack was not the decisionmaker; Tippens' subjective opinion is the one at issue here, and Defendant has provided a reasonably specific factual basis for that opinion.

nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.  See Chapman, 229 F.3d at 1032.  Federal courts do not reexamine an entity's business decisions; inquiry is limited to whether the employer gave an honest explanation of its behavior.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).[30]  Tippen's articulated reason is supported by testimony of Vandenberg, Plaintiff's team leader, regarding Plaintiff's behavior.  It is undisputed that on prior occasions, Plaintiff had hit Vandenberg and had confrontations with Brack.  Furthermore, Plaintiff testified that he did not accuse anyone other than Brack of race discrimination (Pl. dep. 88, 189-90), and Brack was not the decisionmaker with regard to Plaintiff's termination.  Plaintiff has failed to provide evidence to show that NARCO's articulated reason is mere pretext

--------

[30]  "For an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory . . . ."  Elrod, 939 F.2d at 1470 (quoting Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982); see also Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) (holding that discharge was not "because of race" and employer had not violated § 1981 if employer fired employee because it honestly believed employee had violated company policy, even if it was mistaken in that belief); EEOC v. Total System Servs., Inc., 221 F.3d 1171, 1175-76 (11th Cir. 2000).

for discrimination.  See Burdine, 450 U.S. at 256.  In fact,

Plaintiff testified that there was no reason Tippens should have

known that Brack wasn't telling the truth at the time of

Plaintiff's termination.[31]  (Pl. dep. 204).

The Court emphasizes that Plaintiff was only employed with

Defendant NARCO for nineteen days and that the only conduct

actionable in this case is that which occurred during Plaintiff's

employment with Defendant NARCO.  Plaintiff's former employer,

BISCO, is not a defendant in this case.  And, while evidence of

events occurring between Plaintiff and Brack during their

employment with BISCO may be relevant to show "animus" on the

part of Brack, such conduct is not actionable in this case.

While the evidence is clear that Plaintiff and other employees of

Defendant NARCO had difficulty working with Brack, Plaintiff has

---

[31]  Tippens testified that after Brack left employment with
NARCO in January or February of 2000, he found out a lot of
things that "if [he]'d known early on, [he] would have fired Mr.
Brack on the spot," such as Brack's aggressive and threatening
manner of dealing with all employees:  "lead[ing] by intimidation
and threats."  However, he testified that he received no
complaints of race discrimination or inappropriate behavior on
Brack during the time frame material to this action.  (Tippens
dep. 23-26, 36, 57).  Although he at some point viewed Brack's
Memorandum of the events on May 14, 1999, which contained
Plaintiff's allegations that Brack was racist and prejudiced, it
is unclear when in May 1999 Tippens reviewed the memo (before or
after Plaintiff's termination).  (Tippens dep. 71-72).

38

failed to show that Defendant's employment decisions were motivated by Plaintiff's race.  Plaintiff has failed to rebut Defendant's legitimate and nondiscriminatory reasons for the conduct at issue and has failed to otherwise prove that intentional discrimination did indeed motivate Defendant NARCO. Therefore, Defendant is entitled to summary judgment in its favor as to all of Plaintiff's disparate treatment claims.

## 2.  Retaliation

Plaintiff claims that Defendant NARCO retaliated against him for complaining of race discrimination by terminating his employment and by "black-balling" him with other employers.[32] (See Compl. ¶¶ 62-64).  Defendant argues that Plaintiff has no evidence to support these allegations.  Plaintiff argues that he has established a prima facie case of retaliation.

The Court finds that Plaintiff has failed to establish a prima facie case of retaliation.  As explained above, Plaintiff was subject to an adverse employment action:  the termination of his employment.  However, he has failed to establish that he

---

[32]  As indicated above, Plaintiff also makes other complaints of retaliation relating to job assignments, overtime, criticism, and discipline.  However, Plaintiff has failed to come forward with sufficient evidence to establish a prima facie case of retaliation on these bases.

engaged in protected activity and his employer was aware of that

activity at the time of the challenged decision. See Maniccia,

171 F.3d at 1369.

Plaintiff's employment was terminated on May 19, 1999.

Plaintiff filed his EEOC Charge on June 10, 1999. (Pl.'s Exh. A,

EEOC Charge).  The filing of his EEOC Charge is the only

"protected activity" that Plaintiff has established by the

evidence.[33]  Because he filed the charge subsequent to his

---

[33]  Internal complaints of race discrimination are also
protected activity within the meaning of the statute. See Johnson
v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501,
507 (11th Cir. 2000). Plaintiff alleges that he complained to
Dennis Acker, while at BISCO, of racial harassment by Brack (see,
e.g., Pl. dep. 69, 120, 149-50); such complaints are not
actionable, because they occurred prior to Plaintiff's employment
with Defendant NARCO.  Plaintiff also alleges that, when NARCO
took over the BISCO contract with Tuscaloosa Steel, he complained
to Groth that he could not believe NARCO had hired Brack with all
of the complaints of race discrimination against Brack.  (See
Compl. ¶ 15).  Prior to his termination, Plaintiff accused Brack
of being racist or prejudiced, which Brack denied.  (Brack dep.
39-41).  Andre, an African-American employee of BISCO (whose
employment was terminated for sleeping on the job), also accused
Brack of being racist.  (Brack dep. 42).  Plaintiff also alleges
that he complained to Groth during his employment with NARCO
about "the way Ralf was talking to [Plaintiff] and cursing [him]
and everything."  (Pl. dep. 198; see also Pl. dep. 189).  It is
not clear that such complaints involved allegations of "race
discrimination" during Plaintiff's nineteen-day employment at
NARCO. Plaintiff has failed to provide substantial evidence to
establish that these alleged statements were "protected activity"
during Plaintiff's employment with NARCO.  Even if they were
considered protected activity, Plaintiff's retaliation claims
based on his termination would still fail because Plaintiff has

40

termination, he did not engage in protected activity of which

NARCO was aware prior to his termination on May 19, 1999.[34]

He has also failed to establish that NARCO "black-balled"

him with other employers in retaliation for his EEOC Charge.

Plaintiff has alleged that NARCO had him fired from subsequent

employment at Reno Construction; however, Plaintiff testified

that he still worked for Reno on an off-and-on basis.  (See

Plaintiff dep. 59).  Plaintiff also alleged that Brack kept him

from reemployment with BISCO, even though BISCO was hiring.

However, Plaintiff has failed to provide sufficient evidence of

NARCO preventing him from getting rehired by BISCO.[35]  (Plaintiff

dep. 12, 199-200; Groth dep. 88-89).  To the contrary, Defendant

has provided evidence that it did not give poor job references on

---

failed to rebut Defendant's legitimate and nondiscriminatory
reasons for terminating Plaintiff, as set forth in the text of
this Memorandum.

[34]  Tippens testified that after Plaintiff's termination,
Plaintiff's girlfriend, Sandra Palmer called to say that
Plaintiff was going to file charges of race discrimination.
(Tippens dep. 73; Brack Memo (May 19, 1999)).

[35]  Plaintiff has alleged that Brack gave a negative
recommendation that kept him from being rehired at BISCO.
Although there is some evidence that Brack talked with Burt Rally
(BISCO manager) regarding Plaintiff's lawsuit, it is unclear when
this occurred or how this conversation prevented Plaintiff from
being rehired at BISCO.  (See Brack dep. 10; Groth dep. 88-89).

Plaintiff.   (See Brack dep. 107-08, 114-16; Tippens dep. 67).
Brack testified that he never learned Plaintiff had filed a
charge with the EEOC and did not know what the EEOC was.   (Brack
dep. 11).   Plaintiff has failed to establish the requisite
"causal connection" between his protected activity and the
alleged "black-balling"; furthermore, he has failed to establish
that the alleged "black-balling" constituted an "adverse
employment action."   Accordingly, Plaintiff has failed to
establish a prima facie case of retaliation.

Even assuming that Plaintiff has established a prima facie
case of retaliation, Defendant has articulated the same
legitimate and nondiscriminatory reasons, and Plaintiff has
offered no evidence other than that produced as to his disparate
treatment claims; the Court has earlier determined such evidence
to be insufficient.   That same evidence serves Plaintiff here no
better than it served him as to those claims.   He simply has not
come forward with sufficient evidence to demonstrate a genuine
issue of fact as to the truth of each of defendant's proffered
reasons for its challenged actions.   See Reeves, 120 S. Ct. at
2108-09; Chapman, 2000 WL 1459447, at *8 & n.11; Combs, 106 F.3d
at 1529.   Nor has he otherwise shown that Defendant's motive was
intentional retaliation based upon Plaintiff's race.

42

The Court again emphasizes that Plaintiff was only employed with Defendant NARCO for nineteen days, and only employment decisions or conduct occurring within that nineteen-day period are actionable in this case.  In short, in order to prevail on Defendant's summary judgement motion, Plaintiff must come forward with evidence sufficient for a reasonable jury to conclude that the challenged decisions were indeed motivated by intentional discrimination or that Defendant's proffered legitimate reasons were merely a pretext for illegal discrimination.  Plaintiff has not carried his burden of production.[36]  At best, he is only quarreling with Defendant's articulated reasons, which is not sufficient.  See Chapman, 229 F.3d at 1030.

In summary, the Court finds that no material issues of fact remain and that Defendant NARCO is entitled to judgment as a matter of law as to all claims asserted by Plaintiff.[37]  A

---

[36] "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors [including] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered . . . ."  Reeves, 120 S.Ct. at 2109.

[37]  As Defendant is prevailing as to all claims, the Court will not address the aspect of Defendant's motion seeking to limit recovery under McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 356-62 (1995) (holding that, as a general rule in

43

separate order will be entered.

DONE this _24th_ day of August, 2001.


_James H. Hancock_
SENIOR UNITED STATES DISTRICT JUDGE

cases of unlawful discharge in which after-acquired evidence of
wrongdoing would have resulted in lawful discharge, neither
reinstatement nor front pay is an appropriate remedy).

44